**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **ROBERT M. CALHOUN,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
|     **v.** ) | **CAUSE NO. 1:12-CV-00204** |
| ) | |
| **CAROLYN W. COLVIN,**[1] ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
|     **Defendant.** ) | |

**OPINION AND ORDER**

Plaintiff Robert M. Calhoun appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Supplemental Security Income ("SSI") and

Childhood Disability Benefits ("CDB").[2]  (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be AFFIRMED.

**I.  PROCEDURAL HISTORY**

Calhoun applied for SSI and CDB in the fall of 2008, alleging disability since his birth on

September 26, 1990.  (Tr. 21, 29, 148-54.)  The Commissioner denied his applications initially

and upon reconsideration (Tr. 79-86, 90-95), and Calhoun requested an administrative hearing

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin is now the Acting Commissioner.  As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue.  FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (Docket # 13); *see* 28 U.S.C. § 636(c).  It is unclear whether Calhoun is appealing the denial of his applications for both SSI and CDB or only for SSI.  (*Compare* Compl. ¶ 1 (referencing only Calhoun's SSI application), *and* Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 1 (mentioning only SSI), *with* Opening Br. 1-2 (citing to the initial denial of Calhoun's CDB application as well).)  Nonetheless, the Court will assume that he is appealing both denials.

(Tr. 96-97).  Administrative Law Judge ("ALJ") John S. Pope conducted a video hearing on June 23, 2010, at which Calhoun, who was represented by counsel; his mother; and a vocational expert ("VE") testified.  (Tr. 37-74.)  On January 27, 2011, the ALJ rendered an unfavorable decision to Calhoun, concluding that he was not disabled because he could perform a significant number of jobs in the economy.  (Tr. 21-30.)  The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7, 354-74.)

Calhoun filed a complaint with this Court on June 20, 2012, seeking relief from the Commissioner's final decision.  (Docket # 1.)  In his appeal, Calhoun argues that the ALJ erred by (1) failing to properly account for his moderate deficiencies in maintaining concentration, persistence, or pace in the hypothetical posed to the VE and (2) improperly evaluating the credibility of his symptom testimony.  (Opening Br. 18-25.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Calhoun was twenty years old (Tr. 29-30) and had his high school equivalency degree ("GED") (Tr. 46, 555), but no past relevant work experience (Tr. 46).  Calhoun alleges he became disabled due to bipolar disorder, generalized anxiety disorder, dysthymic disorder, personality disorder, and fetal alcohol syndrome.  (Opening Br. 2.)

### B.  Calhoun's Testimony at the Hearing

At the hearing, Calhoun testified that he lives with his mother, stepfather, and uncle and has a girlfriend.  (Tr. 45, 56.)  He stated that he has never worked a full-time job, but has looked for one; when he gets a job, it usually only lasts a week because he cannot keep the pace.  (Tr.

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1127-page administrative record necessary to the decision.

46.)  Calhoun represented that, when he attempted sheltered work at Alliance Industries for a

week, he would become bored, get off track, forget what he was doing, and space out; when put

back on task, he would last fifteen to twenty minutes before spacing out again.  (Tr. 53, 60, 62.)

Calhoun identified his conditions as depression, bipolar disorder, and mild schizophrenia

and reported that he is on medication that help these issues, but cause constant, mild tremors in

his hands and do not eliminate his suicidal and homicidal thoughts.  (Tr. 48, 52-53, 58-59.)  He

sees Andrew Liechty, a counselor, every week.  (Tr. 55.)  Before Mr. Liechty, Calhoun was

treated at Park Center and saw Greg Banicki, a therapist, every one to two weeks, and sometimes

twice a week if necessary.  (Tr. 54-55.)  For the past three or four years, he has also seen Dr.

Mumtaz, who prescribes his medication, at Park Center every two to three months.  (Tr. 55.)

On a typical day, Calhoun testified that he will get up around noon and shower if he has

plans; otherwise he will put clothes on and sit around the house for most of the day.  (Tr. 48-49.)

If friends call, he may walk to meet them, but without a reason to leave the house, he just stays

inside and plays on the computer.  (Tr. 49.)  Calhoun stated that he can dress himself okay, but

that he cannot groom and bathe very well unless he honestly tries to do so; he indicated that his

problem is motivation.  (Tr. 51.)  Calhoun stated that he can make simple meals that do not

involve the stove, but can only do a few, very simple chores like sweeping the floor and

vacuuming.  (Tr. 51-52.)  Calhoun further described his concentration problems, giving his

inability to keep "contact with [the ALJ] mentally" at the hearing as an example.[4]  (Tr. 57.)

---

[4] Calhoun's mother also testified at the hearing, essentially corroborating his testimony. (Tr. 63-69.)  She
further reported that Calhoun will sometimes go five days without bathing or shaving or four weeks without doing
laundry and that she has to remind him to brush his teeth.  (Tr. 67.)

3

*C.  The VE's Testimony*

An impartial VE also testified at the hearing.  (Tr. 69-73.)  The ALJ posited to the VE a hypothetical of an individual between 18 and 19 years old, educated at the GED level, with no past relevant work, who was limited to unskilled, simple, repetitive tasks and could not work in an environment where frequent and intense socializing was pertinent to job functioning.  (Tr. 70-71.)  The VE opined that such an individual could perform a total of 100,000 light jobs, such as food preparation worker and housekeeper, and 50,000 medium jobs like dishwasher.  (Tr. 71.)

*D.  Summary of the Relevant Medical Evidence*

In 1994, Calhoun was diagnosed with fetal alcohol effect.  (*See* Tr. 492.)  Three years later, Calhoun was diagnosed with attention deficit hyperactive disorder, oppositional defiant disorder, fetal alcohol syndrome by history, and rule out motor delay.  (Tr. 509.)  In 1998, an occupational therapy evaluation revealed deficits in the performance component of psychosocial skills/psychological component, which impacts self-management and self-control.  (Tr. 506.)

Seven years later, in December 2005, a fifteen-year-old Calhoun was adjudicated delinquent after admitting to a sexual abuse charge.  (Tr. 314.)  Dr. John Newbauer conducted psychological testing on Calhoun at the end of December.  (Tr. 325-32.)  Because of concerns of probable random responding or number or reading difficulties, Dr. Newbauer warned that the test results were probably an exaggerated, distorted overstatement of Calhoun's symptoms and problems.  (Tr. 326.)  The tests revealed mild overall problems with patience, impulse control, frustration tolerance, and ability to plan.  (Tr. 326.)  Cognitively, Calhoun was found to be functioning in the average range.  (Tr. 328.)  Dr. Newbauer diagnosed Calhoun with generalized anxiety disorder, dysthymic disorder, and personality disorder with schizoid and avoidant

features and assigned a Global Assessment of Functioning ("GAF") of 65.[5]  (Tr. 331-32.)

In August 2006, Calhoun was admitted to the Madison Center for Children (Tr. 802; *see* Tr. 839), where he was diagnosed with generalized anxiety disorder and dysthymic disorder (*e.g.*, Tr. 802) and assigned GAFs of 45 (Tr. 947), 50 (Tr. 816, 820, 826, 834, 953), 53 (Tr. 809), and 55 (Tr. 802).  In February of 2007, Calhoun was administered the Millon Adolescent Clinical Inventory ("MACI").  (Tr. 789-99.)  His profile typified a sullen and irritable temperament, unpredictable and pessimistic moods, a self-destructive disposition, a potential for assaultiveness, and chronic bitterness and resentment.  (Tr. 791.)  The evaluator observed that Calhoun appeared to be experiencing a moderate dysthymic disorder, most probably expressed in agitated form, and noted an inclination toward a bipolar diagnosis.  (Tr. 793.)  After engaging in increasingly worsening defiant, intimidating and bullying behavior, Calhoun was removed from the Madison Center in March 2007 and detained for a more restrictive placement.  (Tr. 947-48.)

The following month, Calhoun was referred to Park Center to address his sexually abusive behaviors and emotional and behavioral instability.  (Tr. 375.)  His initial diagnoses were generalized anxiety disorder, dysthymic disorder, and being a perpetrator of sexual abuse; he was assigned a GAF of 45.  (Tr. 377-78.)  Treatment plans completed in May, August, and October of 2007 contained these same diagnoses and GAF.  (Tr. 415, 420, 425.)  The October treatment plan noted that Calhoun was in the Adolescent Sexual Offender Program ("ASOP")

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id*.  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id*.  And, a GAF score of 61 to 70  reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well."  *Id*.

5

and currently placed at The Redwoods, where he would remain until he no longer required a high level of structure and supervision.  (Tr. 429.)

By January 2008, Calhoun's diagnoses, GAF, and progress were the same; he was still at The Redwoods.  (Tr. 431, 436.)  In February, he saw Dr. Syed Mumtaz at Park Center, stating that his mood was better with no anger or aggression, school was going well, and his medication helped his mood.  (Tr. 394, 396.)

The following month, Calhoun's case manager, Lori Wellman, reported that Calhoun had been transferred to the Leslie House due to his progress in treatment, but that he still needed a higher level of structure and supervision.  (Tr. 401.)  His diagnoses and GAF were unchanged. (Tr. 401-02.)  Ms. Wellman noted that Calhoun struggled with hygiene compliance and remained in all "ADL" groups due to the degree of direct supervision he required.  (Tr. 403.)

A Park Center treatment plan with the same diagnoses and GAF was also completed for Calhoun in March 2008.  (Tr. 438-45.) The school nurse reported that Calhoun had failed to take his prescribed Abilify two to three times a week, which correlated with a decline in distress tolerance and reactive responses to minimal triggers.  (Tr. 444.)

As part of ASOP, Calhoun saw Mr. Banicki for counseling since the end of January 2008.  (Tr. 463.)  In March, Mr. Banicki reported that Calhoun had no unexcused absences for individual sessions and that his attitude was positive; he was currently in Phase I of the five-phase program.  (Tr. 463.)

Ms. Wellman completed a monthly review of Calhoun in April, noting the same diagnoses and GAF and that Calhoun had resumed verbal escalation and banging on walls and objects.  (Tr. 405-08.)  His mood was more irritable and frustrated, and the school reported that

6

he had failed to take his afternoon psychotropic medications, which may have impacted his mood and behavior choices.  (Tr. 407.)  The next month, Ms. Wellman did not alter Calhoun's diagnoses or GAF, but noted that Calhoun had accessed internet pornography at school, exhibited poor anger control and a lack of interest in responsible performance, and was more often challenging, blaming, and rude to staff.  (Tr. 410-12.)

A June 2008 treatment plan contained the same diagnoses and GAF (Tr. 446); Calhoun was actively participating and showing limited progress (Tr. 451).  The treatment plan further related that, at the end of May, Calhoun was returned to his mother's care.  (Tr. 451.)

In November 2008, Mr. Banicki reported that Calhoun had not missed any therapy sessions in September or October and that he remained cooperative and appeared invested in his weekly counseling.  (Tr. 461.)  He was experiencing conflicts with teachers, school administrators, and his parents.  (Tr. 461.)  Because of his school issues, it was determined that it might be best for Calhoun to withdraw from school and attend a GED program, which he subsequently did.  (Tr. 462.)  Later that month, Mr. Banicki wrote a letter to Calhoun's probation officers, stating that Calhoun had completed all of his ASOP Phase I objectives and was recommended for Phase II.  (Tr. 464.)  Mr. Banicki reported that Calhoun had good participation in group and individual sessions since he returned home and that, overall, Calhoun had been cooperative in individual sessions and made significant progress.  (Tr. 464.)

Calhoun saw Dr. Mumtaz again in December 2008. (Tr. 532-35.)  Calhoun's mother reported that he was doing well, his mood was better with no angry outbursts, and his medications were working, but that he had some anxiety about driving.  (Tr. 534.)

In January 2009, Calhoun's mother brought him to the emergency room after he became

7

very agitated and threatened to commit suicide during an argument with his stepfather; he admitted to making the threats, but denied any further suicidal ideation. (Tr. 467.) He was discharged with an impression of depression and directed to follow up with his counselor. (Tr. 467-68.) Calhoun's mother called Park Center the following day, and Dr. Mumtaz increased his Abilify. (Tr. 550-51.) Calhoun also saw Catherine Duchovic, CNS-BC, of Park Center three days later, reporting that his thoughts were calm and he did not feel depressed. (Tr. 536, 538-39.)

Later that month, Sherwin Kepes, Ph.D., performed a mental status evaluation of Calhoun at the request of the state agency. (Tr. 522-26.) Calhoun reported difficulty concentrating for any period of time or on one thing for a long time and that he got agitated quickly when off his medication, which, along with his forgetfulness, affected his work. (Tr. 522.) According to Calhoun, he spent his days basically "goof[ing] off," going to the library to use the computer until his friends and girlfriend got out of school. (Tr. 523.) He did some cleaning and very rudimentary cooking and liked to draw, skateboard, play video games, and hang out with friends. (Tr. 523.) On mental status exam, Dr. Kepes found his memory for both recent and past events adequate, but his general judgment, common sense, ability to interpret proverbs, and ability to see similarities and differences not especially well developed, though not grossly compromised. (Tr. 524.) Ultimately, Dr. Kepes diagnosed Calhoun with attention-deficit/hyperactivity disorder, NOS; bipolar disorder, NOS; personality disorder, NOS; and reported fetal alcohol syndrome and assigned him a GAF of 60. (Tr. 526.)

By the end of January, Mr. Banicki reported that Calhoun had finished all of the ASOP Phase II objectives and was recommended for Phase III. (Tr. 556.) Mr. Banicki represented that

Calhoun had good attendance, was cooperative and appropriate in individual sessions, had participated in group sessions, and had made significant progress in focus and effort during individual sessions over the past several months, maintaining a good motivation level. (Tr. 556.)

Calhoun missed a February 2009 appointment with Dr. Mumtaz (Tr. 540-44), but kept their March appointment, reporting that although his mood was better, he was having problems at home and with his girlfriend and experiencing suicidal thoughts without plan or intent when mad (Tr. 545). Calhoun also stated that he was looking for a job. (Tr. 545.) Dr. Mumtaz found him fully compliant with his medication, but "slightly worse" and prescribed Prozac. (Tr. 547, 549.)

At the beginning of March 2009, B. Randal Horton, Psy.D., a non-examining state agency psychologist, completed a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment" on Calhoun. (Tr. 605-22.) Dr. Horton found that Calhoun had an organic mental disorder, an affective disorder, and a personality disorder (Tr. 605) and moderate difficulties in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace (Tr. 615). Dr. Horton also concluded that Calhoun was moderately limited in seven of twenty work-related mental activities—the abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and maintain socially appropriate behavior and adhere to basic standards

9

of neatness and cleanliness—but not significantly limited in the remaining thirteen areas.  (Tr. 619-20.)  Dr. Horton ultimately determined that Calhoun retained the ability to do at least simple, repetitive tasks in a 40 hour workweek, but preferably not in an environment where frequent and intense socializing was pertinent to the job function.  (Tr. 621.)

By mid-March, Calhoun had completed all of his Phase III and Phase IV objectives and was recommended for Aftercare.  (Tr. 554, 558.)  Mr. Banicki continued to report good attendance and participation and also stated that Calhoun had improved in community, social, and family interaction, received his GED, and obtained full-time employment.  (Tr. 553-54, 558.)

Calhoun saw Dr. Mumtaz again in April 2009, reporting that he had been fired from two jobs; although Calhoun claimed he had a difficult time with the pace, his mother stated that the reason given was a lack of motivation.  (Tr. 600.)  Calhoun had tried to live on his own, but was forgetting to take his medications; he was back living with his parents.  (Tr. 600.)  Dr. Mumtaz found him erratic in his medication compliance and increased his Prozac.   (Tr. 602, 604.)

In May 2009, Calhoun completed the ASOP requirements and graduated from the program.  (Tr. 1033.)  Mr. Banicki noted that, overall, Calhoun seemed to be doing well and had obtained employment; he recommended Calhoun for release from juvenile probation.  (Tr. 1033.)

A Park Center treatment plan completed in July 2009 added impulse control disorder, NOS, to Calhoun's diagnoses; his GAF remained a 45.  (Tr. 1053.)  He was reassigned to Mr. Liechty for counseling.  (Tr. 1055, 1114.)

Calhoun returned to Dr. Mumtaz in September, reporting that he was happy most of the

10

time, but sometimes sad because he had not yet found a job.  (Tr. 1048.)  At the same time, he was going out, skateboarding, and socializing with friends, and his mother indicated that he had not talked about dying or hitting himself and was looking for a job.  (Tr. 1048.)  Dr. Mumtaz found that he was "much better."  (Tr. 1050.)  A treatment plan completed at the end of the month contained the same diagnoses and GAF as the July plan.  (Tr. 1043.)

Dr. Mumtaz saw Calhoun again in November 2009; Calhoun stated that he was doing better, had a better mood, had not had suicidal or homicidal thoughts for over a month, was still looking for a job, and was living with his girlfriend's parents.  (Tr. 1038.)  Dr. Mumtaz noted that he was fully compliant with his medication and symptomatic but stable.  (Tr. 1040.)

At the end of November, Calhoun was reevaluated by Mr. Leichty, stating that he was there to address family problems, anger difficulties, and sound decision-making.  (Tr. 1113.)  He claimed that he had very few friends and was not in a romantic relationship.  (Tr. 1113.)  Mr. Leichty found that, based on Calhoun's self report and treatment history, he demonstrated symptoms of bipolar disorder without presenting psychosis.  (Tr. 1113.)  A treatment plan completed by Mr. Leichty in December included a diagnosis of bipolar disorder, type 1, and a GAF of 47.  (Tr. 1087.)  The next month, Mr. Leichty wrote in a letter that Calhoun exhibited difficulty remaining alert and engaged in conversation during their weekly sessions.  (Tr. 1086.)

Also in January 2010, Calhoun returned to Dr. Mumtaz, reporting that his mood was better, but he still missed his medication twice a week, which caused him to become angry and sometimes have suicidal thoughts.  (Tr. 1106.)  Dr. Mumtaz discussed with him the importance of taking his medication daily.  (Tr. 1108-09.)  Calhoun missed his March appointment with Dr. Mumtaz.  (Tr. 1100-04; *see* Tr. 1096.)

In April, Calhoun's mother called Park Center requesting an anti-anxiety medication after Calhoun was increasingly agitated, not sleeping, constantly crying, and expressing suicidal desires. (Tr. 1096.)  Dr. Mumtaz increased his Effexor XR.  (Tr. 1096.)  The next month, Calhoun's mother called Park Center again, stating that Calhoun was struggling daily with increased anxiety, depression, and agitation and had considered being hospitalized.  (Tr. 1094.) She wanted him put on Buspar for anxiety, but Dr. Mumtaz disagreed; she then reported that Calhoun was not taking his Effexor XR because he said it was not working.  (Tr. 1094.)

At the beginning of June 2010, Calhoun saw Dr. Mumtaz, stating that he did not want to take any medication because they caused side effects, but that he was there because his mother wanted him to try Buspar.  (Tr. 1088.)  Dr. Mumtaz found him noncompliant with his medication and observed an irritable mood.  (Tr. 1090.)  He prescribed Buspar.  (Tr. 1091-92.)

Also in June, Mr. Leichty wrote a letter in which he indicated that Calhoun's diagnoses were bipolar disorder I, most recent episode manic, without psychotic features.  Mr. Leichty explained that Calhoun had made limited progress toward treatment goals because of heightened conflict with his father, difficulty finding gainful employment, and medication management issues and recommended continued therapy and medication services.  (Tr. 1111.)

Lili Hand, the Executive Director of Alliance Industries, a sheltered workshop where Calhoun worked since April 2010, also penned a letter in June, stating that Calhoun, who was on a personal leave of absence, had problems dealing with his work environment at times, difficulty focusing on his work, and complained of sleepiness due to medication, all of which negatively affected his productivity and attendance.  (Tr. 350.)  Ms. Hand also noted that Calhoun required more supervision to keep him on task and that his productivity was at 51 percent.  (Tr. 350.)

12

In response to an inquiry from Calhoun's attorney about his ability to function in an employment setting, Mr. Leichty penned another letter in July 2010. (Tr. 1120-21.) Mr. Leichty indicated that he had reviewed Ms. Hand's report, observing that her comments, rather than conclusively stating that Calhoun was unemployable or unable to perform tasks, suggested only that he struggled to complete tasks efficiently. (Tr. 1120.) He further noted that there was no evidence provided that Calhoun's mental health challenges were the direct and sole cause of his productivity issues. (Tr. 1120.) When questioned about his previous statement that Calhoun had difficulty finding gainful employment, Mr. Leichty explained that, based on Calhoun's and his mother's statements that he did not like his job due to the nature of the work and the low pay rate, he believed that Calhoun was unmotivated by his employment through Alliance. (Tr. 1120.) Mr. Leichty also related that Calhoun had indicated that he would better enjoy and perform in a work setting if he could be employed in housekeeping or by a cleaning agency. (Tr. 1120.)

The same month, Dr. Mumtaz completed a "Medical Source Statement" on Calhoun's behalf (Tr. 1125-27), noting that Calhoun's diagnoses were generalized anxiety disorder, dysthymic disorder, and fetal alcohol syndrome and that both his current and highest-past-year GAFs were 55-60 (Tr. 1125). According to Dr. Mumtaz, Calhoun's main problem was failing to take his medications as prescribed; Dr. Mumtaz stated that Calhoun has done well and maintained well when he was taking his medication. (Tr. 1126.) Ultimately, Dr. Mumtaz explained that before making any statement about the extent of Calhoun's impairment, he would like Calhoun to take his medication daily and regularly participate in therapy; he thought Calhoun could function if he was medication compliant. (Tr. 1127.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### *A.  The Law*

Under the Act, a claimant is entitled to CDB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

14

mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 402(d)(1), 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  To be entitled to CDB, the claimant must have a disability that began before the age of 22.  42 U.S.C. § 402(d)(1)(B).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a); *see* 20 C.F.R. §§ 404.1520(a)(2), 416.920(a)(2). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

*B.  The ALJ's Decision*

On January 27, 2011, the ALJ rendered his decision.  (Tr. 21-30.)  At step one of the analysis, the ALJ found that Calhoun had not engaged in substantial gainful activity since his alleged onset date and, at step two, concluded that Calhoun suffered from the following severe impairments: fetal alcohol effect, dysthymic disorder, and generalized anxiety disorder.  (Tr. 23.)  Nonetheless, at step three, the ALJ determined that Calhoun's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 24-25.)  Before proceeding to step four, the ALJ determined that Calhoun's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the following RFC (Tr. 26):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: except the claimant is limited to performing simple, unskilled, repetitive work.  Additionally, the claimant is precluded from working in an environment where frequent and intense socializing is pertinent to job functioning.

(Tr. 25).

At step four, the ALJ found that Calhoun had no past relevant work.  (Tr. 29.)  Based on the RFC and the VE's testimony, the ALJ then determined at step five that Calhoun could perform a significant number of jobs within the economy, including food preparer, housekeeper, and dishwasher.  (Tr. 29-30.)  Thus, Calhoun's claims for SSI and CDB were denied.  (Tr. 30.)

*C.  The ALJ Adequately Accommodated Calhoun's Moderate Deficits in
Concentration, Persistence, or Pace in the Hypothetical Posed to the VE*

First, Calhoun argues that the ALJ erred when posing a hypothetical to the VE at step five by failing to account for his moderate deficiencies in maintaining concentration, persistence, or pace.  (Opening Br. 18-22.)  Calhoun's argument, however, does not justify a remand.

16

To explain, at step two of the five-step sequential analysis, the ALJ must determine whether a claimant's impairments are "severe."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  In determining the severity of a claimant's mental impairments at step two, the ALJ addresses the claimant's degree of functional limitation in four "broad functional areas": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).  The Seventh Circuit Court of Appeals has stated that the ALJ must then "incorporate" these limitations into the hypothetical questions posed to the VE at step five.  *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (finding that the ALJ erred when his hypothetical question to the VE failed to take into account his finding at step two that the claimant had deficiencies in social functioning and concentration, persistence, and pace); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) (remanding case where the ALJ failed to adequately account for the claimant's social limitations in the RFC); *see also Kasarsky v. Barnhart*, 335 F.3d 539, 543-44 (7th Cir. 2003).  Stated more broadly, "to the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate *all* relevant limitations from which the claimant suffers." *Kasarsky*, 335 F.3d at 543-44 (emphasis added).

At step three here, the ALJ found that Calhoun had moderate difficulties in activities of daily living; in social functioning; and in maintaining concentration, persistence, or pace.  (Tr. 24-25.)  After determining that Calhoun's mental impairments were significant enough to be "severe" but not severe enough to meet a listing-level impairment, the ALJ assigned him a RFC limiting him to "simple, unskilled, repetitive work" in an environment where frequent and

17

intense socializing was *not* pertinent to job functioning.  (Tr. 25.)  The ALJ's hypothetical to the VE incorporated this same RFC.  (Tr. 71.)  Contrary to Calhoun's argument, in this instance, the ALJ adequately accounted for his deficiencies in maintaining concentration, persistence, or pace in the hypothetical posed to the VE.

Significantly, in formulating the hypothetical for the VE, the ALJ relied—almost verbatim—on the opinion of Dr. Horton, the state agency psychologist who opined that Calhoun could do at least simple, repetitive tasks in a 40 hour workweek, but preferably not in an environment where frequent and intense socializing was pertinent to the job function.  (Tr. 621.)  Before drawing this conclusion, Dr. Horton rated Calhoun's functional limitations, finding—just as the ALJ did—that he had moderate difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (Tr. 615.)

The instant circumstances are analogous to the facts confronting the Seventh Circuit in *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002).[7]  There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  *Id*.  In posing a hypothetical to the VE, the ALJ relied upon the opinion of a

---

[7] Calhoun, however, contends that the instant facts are more analogous to those presented in *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011), in which the Seventh Circuit found that a limitation to "sedentary" and "light" unskilled work was not sufficient to accommodate deficiencies in the claimant's ability to maintain regular work attendance, carry out instructions, and deal with the stresses of full-time employment.  But there is no indication in the *Jelinek* opinion that the state agency psychologists actually articulated that the claimant could perform simple, repetitive tasks like Dr. Horton did here.  Of course, "[t]he regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise."  *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 839 (N.D. Ind. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  Therefore, *Jelinek* is distinguishable from the instant circumstances.

The facts at hand are also distinguishable from those presented in *O'Connor-Spinner*, 627 F.3d at 617-18.  There, the ALJ failed to incorporate all of the mental limitations assigned in the RFC into the hypothetical posed to the VE at step five.  *Id*.  Here, the hypothetical posed by the ALJ to the VE at step five includes all of the limitations assigned in the RFC. (*Compare* Tr. 70-72, *with* Tr. 25.)

18

consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work."  *Id*.  The Seventh Circuit concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work."  *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Horton essentially "translated [his] findings into a specific RFC assessment."  314 F.3d at 288.  That is, Dr. Horton concluded that, despite Calhoun's moderate difficulties in activities of daily living, social functioning, and maintaining concentration, persistence, or pace (Tr. 615), he could still perform simple, repetitive tasks, though preferably not an environment where frequent and intense socializing was pertinent to job functioning (Tr. 621).

The ALJ's hypothetical to the VE almost mirrors Dr. Horton's language, adding only a limitation to "unskilled" work along with a limitation to "simple, repetitive tasks."  (Tr. 71.) Calhoun argues that this limitation to "unskilled work" did not provide any limitation in the seven areas of work-related mental activities in which Dr. Horton found Calhoun moderately limited.  But, once again, Dr. Horton translated his findings into a specific RFC, concluding that, despite these moderate limitations, Calhoun could still perform at least simple, repetitive tasks in

a 40 hour workweek, preferably not in an environment where frequent and intense socializing

was pertinent to job functioning.  (Tr. 619-21.)  As such, these limitations were incorporated into

Dr. Horton's translation, and the ALJ was entitled to rely on that translation when formulating a

hypothetical question for the VE.  *See Susalla v. Astrue*, No. 1:11-cv-00164, 2012 WL 2026268,

at *6 (N.D. Ind. June 5, 2012) ("The Seventh Circuit has held that when a medical source of

record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on

that opinion in formulating a hypothetical question for the VE." (citing *Milliken*, 397 F. App'x at

221-22; *Johansen*, 314 F.3d at 289; *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *Howard

v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001))).

      Because the ALJ's hypothetical to the VE relied on Dr. Horton's translation of Calhoun's

abilities, including his moderate difficulties in maintaining concentration, persistence, or pace

and in seven work-related mental activities, the ALJ did not err in this regard.

### D.  The ALJ's Credibility Determination Will Not Be Disturbed

      Calhoun also contends that the ALJ improperly discounted the credibility of his symptom

testimony.  (Opening Br. 22-25.)  Ultimately, however, this challenge is also unpersuasive.

      Because the ALJ is in the best position to evaluate the credibility of a witness, his

determination is entitled to special deference.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see

Ottman*, 306 F. Supp. 2d at 838, creating "an accurate and logical bridge between the evidence

and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will

be upheld unless it is "patently wrong."  *Powers*, 207 F.3d at 435; *see also Carradine v.*

*Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Calhoun first argues that the ALJ cherry picked the evidence concerning his daily living activities, ignoring that he had great difficulty with daily activities even in halfway houses and structured environments; that his mother reported that he needed to be reminded to shower, shampoo his hair, and shave and had trouble keeping on task while performing these activities; and that his case manager indicated twice that he needed to remain in all "ADL" groups due to the degree of direct supervision he required.  (Opening Br. 23-24.)  Admittedly, while the ALJ recounted Calhoun's own testimony at the hearing that he was able to dress, groom, and bathe independently, cook simple meals, and sweep and vacuum the floors (Tr. 26), he did not mention this other evidence.  But the ALJ need not discuss or make a written evaluation of every piece of evidence; at the same time, however, he may not select and discuss only that evidence which favors his ultimate conclusion or ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Anderson v. Astrue*, No. 1:10-cv-00587-SEB-MJD, 2011 WL 3739257, at *4 (S.D. Ind. Aug. 23, 2011); *Spencer v. Astrue*, No. 1:07-CV-00131, 2008 WL 1836669, at *6 (N.D. Ind. Apr. 22, 2008).  That, however, is not what the ALJ did here.

Although the ALJ did not mention every piece of evidence suggesting that Calhoun struggled with his activities of daily living, he explicitly recounted evidence that Calhoun has trouble keeping up pace with tasks and staying on track and that his impairments purportedly affect his ability to remember, complete tasks, concentrate, understand, follow directions, and

get along with others.  (Tr. 26.)  Moreover, in the credibility assessment, the ALJ highlights an inconsistency in Calhoun's statements, noting that in an earlier function report he indicated that he does all the chores he is asked to do, experiences no problems with personal care, and prepares meals (*see* Tr. 221, 251), while in a later one he contended that he does not prepare meals (*see* Tr. 285).  (Tr. 27.)  The ALJ was entitled to consider any inconsistent statements in determining Calhoun's credibility.  *See Hill v. Astrue,* No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a claimant's credibility where discrepancies were noted between her testimony and her statements to her physicians); *Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107, at *8 (N.D. Ill. Aug. 20, 1998) (same); 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency . . . .  The adjudicator must consider such factors as . . . [t]he consistency of the individual's own statements.").

And the ALJ did not discount Calhoun's credibility solely because of his activities of daily living.  He further concluded that objective evidence of record and other evidence did not support a finding of disabling impairments, pointing out that both Calhoun and his mother represented that he was looking for a job  (Tr. 27.)  Calhoun takes issue with this reason as well, arguing that the ALJ again cherry picked the evidence, failing to note that Calhoun had reportedly been fired from two jobs because he had difficulty with the pace and that his mother stated he lacked motivation.  (Opening Br. 24.)

It was permissible for the ALJ to consider statements that Calhoun made indicating that he was looking for work.  *See Knox v. Astrue*, 327 F. App'x 652, 656 (7th Cir. 2009) (unpublished) ("[I]t is appropriate for the ALJ to consider any representations [that the claimant]

has made to state authorities and prospective employers that he can work."). Although the ALJ

did not mention Calhoun's report to Dr. Mumtaz in April 2009 that he had been fired from two

jobs because, according to him, he had a difficult time with the pace (Tr. 600), the ALJ did note

Calhoun's trouble keeping up pace with tasks (Tr. 26). Moreover, there is practically no

evidence in the record establishing what these jobs were, how long Calhoun worked there, or the

actual reason why he was fired; in fact, he and his mother provided conflicting explanations,

with his mother claiming he was fired due to a lack of motivation rather than pace difficulties

(Tr. 600). Yet, it is Calhoun, who is represented by counsel, who bears the burden of supplying

adequate records and evidence to prove he is disabled. *Castile v. Astrue*, 617 F.3d 923, 927 (7th

Cir. 2010); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004); *see also Glenn* v. *Sec'y*

*Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social

security benefits is represented by counsel the administrative law judge is entitled to assume that

the applicant is making his strongest case for benefits.").

    Furthermore, the ALJ explicitly addresses Calhoun's ability to work later in his opinion,

recounting the letter written by Mr. Leichty, Calhoun's counselor, in which he recounted

Calhoun's statements that he would better enjoy and perform in a work setting if he could be

employed in housekeeping or by a cleaning agency.[8] (Tr. 28 (citing 1120).) The ALJ concluded

that "these statements sound like assertions made by someone who would prefer a certain type of

employment, as opposed to someone who is disabled" (Tr. 28), a conclusion supported by other

evidence in the record, such as a statement in a function report that Calhoun "seldom finishes

what he starts, unless it is a pleasurable thing" (Tr. 222). As such, the ALJ at least implicitly

---

[8] Notably, the VE gave housekeeper as an example of a light job Calhoun could perform. (Tr. 71.)

considered that Calhoun purportedly lacked motivation to work, concluding—from his own statements and the opinion of his counselor—that he could be motivated to work if he obtained a certain kind of employment.  Thus, the ALJ did not commit reversible error by failing to mention Calhoun's vague report that he was fired from two jobs and the conflicting reasons.

Next, Calhoun claims that the ALJ erred by discrediting his testimony based on his medication noncompliance without fulfilling his duty under SSR 96-7p to investigate any reasons for it.  (Opening Br. 24.)  According to SSR 96-7p, an "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."  SSR 96-7p, 1996 WL 374186, at *7.  As such, "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment."  *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citing SSR 96-7p).

In this case, contrary to Calhoun's argument, the ALJ did not discount his credibility because of his medication noncompliance.  Rather, the ALJ referenced this noncompliance when recounting and weighing the opinion of Dr. Mumtaz, who noted that Calhoun's main problem was not taking his medication as prescribed.  (Tr. 27 (citing Tr. 1126).)  The ALJ then agreed with Dr. Mumtaz's opinion that Calhoun has done well when on his medication and that his prognosis was good as long as he took his medication as prescribed, assigning it substantial weight.  (Tr. 27.)  Nowhere did the ALJ draw an adverse inference from Calhoun's noncompliance or use it to discredit his testimony about the severity of his impairments; the ALJ

simply agreed with Dr. Mumtaz's opinion of Calhoun's prognosis when he is compliant with medication.  Thus, because the ALJ did not rely on Calhoun's noncompliance to make his adverse credibility finding, the ALJ did not err in failing to investigate any reasons for it.

In his fourth challenge to the ALJ's credibility determination, Calhoun contends that the ALJ again cherry picked the evidence by failing to discuss the GAF scores of 45 that Park Center staff assigned him, which indicate serious symptoms or limitations in functioning, while mentioning the higher GAF scores of 65, 60, and 55-60 assigned by Dr. Newbauer, Dr. Kepes, and Dr. Mumtaz, respectively.  (Opening Br. 24-25; *see* Tr. 27-28.)  First, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished); *see Thomas v. Astrue*, No. 2:11-cv-188-PRC, 2012 WL 2130582, at *7 (N.D. Ind. June 12, 2012) ("[A] GAF score alone is not determinative of disability."); *Curry v. Astrue*, No. 3:09-CV-565 CAN, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability.").  And although "the scores may assist in formulating the claimant's residual functional capacity," *Adams v. Astrue*, No. 1:06-CV-393 RM, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009); *see Bray v. Astrue*, No. 2:10-CV-00352, 2011 WL 3608573, at *9 (N.D. Ind. Aug. 15, 2011), they do "not reflect the clinician's opinion of functional capacity," *Denton*, 596 F.3d at 425.

Yet that the ALJ mentioned only the higher GAFs assigned by Dr. Mumtaz, Dr. Kepes, and Dr. Newbauer and omitted any specific mention of the lower GAFs given by Park Center is

problematic.  *See Walters*, 444 F. App'x at 919 (remanding the ALJ's decision where he cited the claimant's highest GAF scores and omitted the lower ones); *Ingle v. Astrue*, No. 10-cv-1002, 2011 WL 5834426, at *7 (S.D. Ill. Oct. 28, 2011), *report & recommendation adopted,* 2011 WL 5834273 (S.D. Ill. Nov. 21, 2011) (finding that the ALJ erred by "cherry-picking" the claimant's highest GAF score and ignoring the remaining scores); *Salinas v. Barnhart*, No. 03 c 1330, 2004 WL 1660904, at *10-11 (N.D. Ill. July 22, 2004) (same).  But not every misstep justifies a remand, particularly when the ALJ provided other good reasons for discounting Calhoun's credibility.  *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Susalla*, 2012 WL 2026268, at *10 (finding that, because the ALJ provided several other "good reasons" to discount a treating source's opinion, one misstep did not warrant a remand).

And although Calhoun relies on *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010), for the proposition that a GAF of 50 does not support a conclusion that a claimant is mentally capable of sustaining work (Opening Br. 25), *Campbell* is distinguishable from the instant case. In *Campbell*, 627 F.3d at 302-05, 308, the claimant was assigned a GAF of 50 by his treating psychiatrist, who never gave him a GAF higher than 50.  Here, however, Calhoun's treating psychiatrist, Dr. Mumtaz, also of Park Center, *did* give him a GAF of greater than 50, assigning him a highest-past-year and current GAF of 55-60 in July 2010.  (Tr. 1125.)  As such, it is hard to see how explicitly mentioning the GAFs of 45 assigned by other Park Center staff, who did not prepare medical source statements as Dr. Mumtaz did, would change the outcome of the case, making any error in this regard harmless.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th

26

Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case").

Finally, Calhoun maintains that the ALJ erred by not considering the comments of a claims representative who noted that, when Calhoun's claim was taken, he was not paying attention, seemed to fall asleep, was not very responsive when awakened, relied on his mother to give information, and had difficulty responding.  (Opening Br. 25 (citing Tr. 212).)  Yet the ALJ was, once again, not required to discuss or make a written evaluation of every piece of evidence. *E.g.*, *Golembiewski*, 322 F.3d at 917.  And the ALJ did not necessarily have to independently evaluate "redundant" testimony as it is not a separate line of evidence.  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron*, 19 F.3d at 337; *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).

What the claims representative's observations boil down to is that Calhoun had trouble paying attention and responding to questions.  Although the ALJ did not mention the claims representative's comments regarding these issues, the ALJ twice noted Calhoun's hearing testimony that he had problems concentrating such that it was hard to stay focused on questions asked of him at the hearing, that the medical evidence contained entries indicating that Calhoun had difficulties remaining alert and engaged, Calhoun's allegations that he spaces out and gets off track, and Dr. Mumtaz's report that he had difficulty thinking or concentrating.  (Tr. 24-27.) In the end, however, the ALJ determined that Calhoun's statements were not fully credible and that, despite moderate difficulties in maintaining concentration, persistence, or pace, he still retained the ability to perform simple, unskilled, repetitive work in an environment not requiring

27

frequent and intense socializing.  As such, while the ALJ may not have specifically mentioned the claims representative's statements, he adequately addressed the issues raised in those statements and sufficiently articulated his reasoning; thus, a remand is not warranted on this basis.  *See Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (emphasizing that an ALJ need not evaluate every piece of evidence in writing, but must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced); *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.").

In sum, despite Calhoun's various challenges to the ALJ's credibility determination, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Calhoun's testimony of disabling impairments was not entirely credible, and his determination is not "patently wrong."  *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435.  Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will be affirmed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Calhoun.

SO ORDERED.

Enter for this 24th day of July, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge